# COMMONWEALTH OF VIRGINIA



ARLINGTON CIRCUIT COURT
Civil Division
1425 NORTH COURTHOUSE RD
ARLINGTON  VA
(703) 228-7010

Proof of Service

Virginia:
In the ARLINGTON CIRCUIT COURT

Case number: 013CL23002380-00
Service number: 001
Service filed: June 13, 2023

Served by: SPECIAL PROCESS SERVER                                    Judge:
Style of case: MICHAEL CREHAN  vs METROPOLITAN WASHINGTON AIRPOR
Service on: METROPOLITAN WASHINGTON          Attorney: BROWN, CARLA D
              AIRPORTS AUTHORITY
              SERVE: JOHN E. POTTER
              2733 CRYSTAL DRIVE
              TWO POTOMAC YARD
              ARLINGTON VA 22202


   Instructions:

Returns shall be made hereon, showing service of Summons issued Thursday, June 15, 2023 with a copy of the
Complaint filed Tuesday, June 13, 2023 attached.


Hearing date   :
Service issued: Thursday, June 15, 2023

For Sheriff Use Only

# COMMONWEALTH OF VIRGINIA



ARLINGTON CIRCUIT COURT
Civil Division
1425 NORTH COURTHOUSE RD
ARLINGTON VA
(703) 228-7010

Summons

To: METROPOLITAN WASHINGTON
AIRPORTS AUTHORITY
SERVE: JOHN E. POTTER
2733 CRYSTAL DRIVE
TWO POTOMAC YARD
ARLINGTON VA 22202

Case No. 013CL23002380-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Thursday, June 15, 2023

Clerk of Court: PAUL F. FERGUSON

by _____
(CLERK/DEPUTY CLERK)

Instructions:

Hearing Official:

Attorney's name:   BROWN, CARLA D

CL23002380-00
06/13/2023 04:59:12 PM

VIRGINIA:

IN THE ARLINGTON COUNTY CIRCUIT COURT

MICHAEL T. CREHAN       )
1437 Laurel Hill Road      )
Vienna, Virginia 22182    )
                      )
    Plaintiff,        )
                      )
    v.              )
                      )
METROPOLITAN WASHINGTON  )   Case No. CL23-2380
  AIRPORTS AUTHORITY    )
2733 Crystal Drive       )
Two Potomac Yard       )
Arlington, Virginia 22202   )
                      )
SERVE:  John E. Potter    )
        President and CEO, MWAA  )
        2733 Crystal Drive    )
        Two Potomac Yard    )
        Arlington, Virginia 22202 )
                      )
    Defendant.        )

## COMPLAINT

COMES NOW THE PLAINTIFF, MICHAEL T. CREHAN, by counsel, and moves this Court for entry of judgment in his favor, and against the Defendant, METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, and in support of such complaint alleges and avers as follows:

## NATURE OF ACTION

This action states a claim for retaliation/wrongful termination in violation of Va. Code 40.1-27.3 (the Virginia whistleblower protection law, House Bill 798, signed into law on April 11, 2020 by Virginia Governor Ralph Northam).

## PARTIES

1.    Plaintiff, Michael T. Crehan ("Mr. Crehan"), is a resident and citizen of Fairfax County (Vienna), in the Commonwealth of Virginia.  At all times relevant hereto, Mr. Crehan was employed by Defendant Metropolitan Washington Airports Authority as a member of the Legal Department, working out of the Rail Project Office located in Fairfax County, Virginia until 2021 when it moved to offices at Dulles Airport in Loudoun County, Virginia.

2.    Defendant Metropolitan Washington Airports Authority ("MWAA") is headquartered in Arlington County.

3.    MWAA is an independent airport authority, created by interstate compact between the Commonwealth of Virginia and the District of Columbia with the consent of the United States Congress to oversee management, operations, and capital development of the two major airports serving the United States national capital - Ronald Reagan Washington National Airport and Dulles International Airport.

## JURISDICTION

4.    This Court has jurisdiction over Mr. Crehan's claims under the common laws of Virginia.

5.    The amount in controversy exceeds the jurisdictional minimum amount for this Court.

6.    MWAA is headquartered in and regularly conducts business in Arlington County in the Commonwealth of Virginia.

7.    MWAA is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

2

## VENUE

8.     MWAA is present in and regularly conducts affairs and business activities in Arlington County in the Commonwealth of Virginia, and is headquartered in Arlington County in the Commonwealth of Virginia.

9.     Mr. Crehan was, at all times relevant to the allegations herein, Associate General Counsel and a member of the Legal Department of MWAA.  Mr. Crehan worked out of the Dulles Corridor Metrorail Project Office, located in Fairfax County and then Loudoun County starting in 2021, but was subject to a direct reporting line to the MWAA General Counsel and attended weekly staff meetings (either in person or remotely from his office) held in Arlington, with other members of his department located in Arlington County, in the Commonwealth of Virginia.

10.     The majority of the tortious acts and causes of action alleged to have been engaged in, occurred in Arlington County in the Commonwealth of Virginia.

11.     Venue over Mr. Crehan's common law claims is proper under Va. Code 8.01-262(1), (2), (3) and (4).

## BACKGROUND

12.     The Dulles Corridor Metrorail Project Phase 2 is an 11.4-mile extension of the Washington Metropolitan Area Transit Authority's ("WMATA") Silver Line from Wiehle Station through Dulles Airport to eastern Loudoun County (the "Rail Project").  Phase 2 opened service on November 15, 2022.  (Phase 1 opened in July 2014 and connected East Falls Church Station to Wiehle Station.)

13.     The Silver Line was built by MWAA rather than WMATA by agreement among the funding jurisdictions (the United States, the Commonwealth of Virginia, Fairfax and

Loudoun Counties, and MWAA) in part because the MWAA-run Dulles Toll Road provided a large share of the funding. The funding governments agreed that MWAA would manage construction of the project for eventual turnover to WMATA.

14. At the inception of MWAA's role managing the Silver Line project around 2005, Jim Bennett, then head of MWAA, announced during an employee meeting that MWAA would build the Silver Line, and that MWAA employees willing to work on Rail Project would remain employed with MWAA after completion of the Rail Project. This statement by Mr. Bennett was reported to Mr. Crehan by Eric Carey who was present at the meeting. Mr. Carey was, until his retirement in 2021, the main MWAA Contracting Officer on the Rail Project. Other employees in addition to Mr. Carey (including Felicia Payne, Pamela Bolls, Anne Field, and Marcia McAllister) also confirmed that MWAA employees dedicated to the Rail Project were told that they would remain MWAA employees after its completion.

15. Mr. Crehan applied to MWAA based on the same representation that was made to the employees mentioned, as he would not have left his then-current employment for a temporary assignment. Mr. Crehan learned of the MWAA job opening from then-Associate General Counsel (now, General Counsel), Johnna Spera ("Ms. Spera"), whom Mr. Crehan had worked with at a previous job. At the time of Mr. Crehan's application to MWAA, Ms. Spera was the MWAA attorney located at the Rail Project office.

16. During Mr. Crehan's hiring interviews, Naomi Klaus (Associate GC) and Phil Sunderland (GC) raised the topic of whether Mr. Crehan was being hired for just the Rail Project. They both confirmed that Mr. Crehan was being hired into the Legal Department and would remain part of the Legal Department of MWAA when the Rail Project was completed.

4

17. This was further underscored by the fact that MWAA did sometimes hire "term" employees" (for example, a safety expert) whose employment was expressly for a specific time period established, and sometimes extended, to end with the Rail Project. Mr. Crehan was not hired as a term employee, or otherwise under those conditions.

18. Mr. Crehan received an offer letter dated August 28, 2012 for the position of "Associate General Counsel/Business Affairs with [MWAA's] Office of General Counsel at Ronald Reagan Washington National Airport."

19. The Rail Project office was located on Spring Hill Road in Tysons Corner, and had been established several years prior to Mr. Crehan's hiring, so the offer letter could have – but did not – specify that Mr. Crehan's hiring was for the Rail Project office only. All official personnel records reflect Mr. Crehan's status as a member of the MWAA Legal Department.

20. On October 18, 2012, Mr. Crehan received another letter from MWAA regarding his start date. The letter once again confirmed Mr. Crehan's position to be with MWAA's Office of General Counsel at Reagan National Airport.

21. In late 2012, Mr. Crehan's predecessor as Rail Project attorney, Ms. Spera, ended her role as Rail Project attorney and returned to MWAA's General Counsel office at Reagan National Airport.

22. Mr. Crehan's first day of employment with MWAA was October 22, 2012. He reported to the MWAA office at Reagan National Airport, and the next day began working out of the Rail Project Office in Tysons Corner, Virginia.

23. In or around 2013, the then-director of the Rail Project, Sam Carnaggio, told Mr. Crehan that because MWAA employees assigned to the Rail Project would need to be

reabsorbed when the Rail Project was complete, MWAA minimized the number of such employees by relying heavily on outside contractors to supervise the Rail Project.

24.     Mr. Crehan was never part of the Rail Office, known internally as MA-39, but instead, was always part of the Legal Department, MA-70. The Legal Department is a separate department with its own SVP/General Counsel who reports to the MWAA CEO. The Legal Department includes five Associate General Counsel, including Mr. Crehan.

25.     Throughout his employment, Mr. Crehan frequented the main MWAA Legal Department office at Reagan National Airport on occasion, and for over 10 years, participated in weekly Legal Department meetings, sometimes in person but generally by phone or video conference, with other staff from the Legal Department.

26.     Throughout his employment, the MWAA Legal Department administrative assistant provided administrative support to Mr. Crehan from the main General Counsel office at Reagan National, with respect to department events, continuing legal education, bar dues, annual evaluations, annual goals, and other MWAA-related issues.

27.     Though stationed at the Rail Project office, Mr. Crehan performed his work by connecting remotely to the Legal Department's server, and not the Rail Project office server used by all or virtually all other Rail Project staff.

28.     Mr. Crehan's job description on MWAA's website states that his job is performed in the Legal Department's office, and MWAA's organizational charts (every iteration, for the past 10 years) show that Mr. Crehan reports directly to MWAA's General Counsel (working out of Reagan National), and not to the head of the Rail Project department.

29.     Mr. Crehan was unquestionably an employee of the MWAA Legal Department.

30.    Throughout his employment, Mr. Crehan always received excellent annual performance reviews from the General Counsel. Specifically, Mr. Crehan was rated as "highly effective" and told that he is at the top of the scale for an Associate General Counsel. Mr. Crehan was directly told by the former Chairman of the Board and others (including Charles Stark, SVP and Executive Project Director from 2014-2021) that his work was excellent, accurate, respected, ethical, and greatly appreciated.

31.    Similar to the MWAA Contracting Officers who worked in the Rail Office and who retained their jobs in the Procurement department on completion of Rail Project and were not laid off, Mr. Crehan had every reason to expect that he would remain employed with the MWAA Legal Department at the completion of the Rail Project.

32.    Starting in 2013, Mr. Crehan's job involved assisting with the selection (through public procurements) and management of outside counsel and outside claims consultants to help MWAA anticipate and respond to legal claims by the Phase 2 contractors.

33.    On July 26, 2014, Phase 1 of the Rail Project opened to riders.

34.    Starting around 2017, Mr. Crehan's primary work was leading the MWAA team (claims consultant Trauner Consultants and the law firm of Womble Bond Dickinson ("WBD")) to understand, and where appropriate to craft defenses against, contractor claims including the end-of-project claims which had been long threatened, and were eventually made, by HP and CRC.[1] Mr. Crehan also led the team's determination of MWAA claims against the contractors.

_____

[1] Trauner Consultants is prominent claims consulting firm which replaced Delta Consulting in or around 2016 as advisors to MWAA with respect to cost and delay claims by Hensel Phelps Construction Company ("HP") and by Capital Rail Constructors ("CRC"), a joint venture between Clark Construction Group, LLC and Kiewit Infrastructure South Co.

35.     MWAA and its contractors are subject to state and federal false claims statutes applicable to the public funds used to pay for the Rail Project. MWAA has, in writing, formally taken the position that contractor overcharges may violate such statutes.

36.     Mr. Crehan advised MWAA in connection with issues including efforts by MWAA's Phase 2 contractors to obtain the discretionary early release by MWAA of "retainage"[2], the evaluation of claims by the contractors against MWAA, and the evaluation of claims by MWAA against the contractors.

37.     In 2022, MWAA's senior management proposed to enter into global settlements of large contractor claims and MWAA's counterclaims. Mr. Crehan was the MWAA employee most familiar with the contractors' claims and MWAA's counterclaims.

38.     While the 2022 claims settlement discussions were ongoing, Mr. Crehan worked closely with MWAA managers and advisors including Ms. Spera, Mike Ryan, Bill Manginelli, Eric Carey, and Todd Conley to properly evaluate the contractors' claims and MWAA's counterclaims.

39.     MWAA publicly rejected the primary contractor claims on Phase 2. For example, on November 20, 2020 and on April 12, 2022, MWAA issued written decisions that formally rejected the primary contractor claims. In its decisions, MWAA explained its legal and factual reasoning.

40.     On September 8, 2002, the *Washington Post* reported that on July 15, 2022, MWAA agreed to a global settlement with CRC. Earlier, MWAA had entered into a global

---

[2] The portion of the final payment withheld for a defined period to assure a contractor or subcontractor has finished a construction project completely and correctly.

settlement with HP. The settlements are each embodied in a publicly-available change order signed by MWAA and the respective contractor.

41.     Mr. Crehan raised concerns about whether the payments and payment orders to be used to satisfy the change orders were properly justified.

42.     In retaliation for Mr. Crehan's stated concerns and work, MWAA managers took certain steps to circumvent Mr. Crehan's role, as Rail Project counsel, in connection with claims involving the Rail Project.

43.     In or around October 2022, Mr. Crehan had a phone call with Ms. Spera after Mr. Crehan had pressed on numerous occasions for a discussion surrounding his return to the main Legal office. On that call, Ms. Spera told Mr. Crehan that he would be laid off after the completion of the Rail Project through a "reduction in force" of the entire then-remaining Rail Project MWAA employees.

44.     In response to Mr. Crehan's inquiries, Ms. Spera declined to explain how Mr. Crehan could be laid off as part of the Rail Project department, given that Mr. Crehan was actually part of the Legal Department. Ms. Spera stated that the matter was controlled by the Human Resources Department.

45.     As the Rail Project neared completion, approximately eight MWAA employees on the Rail Project team were reabsorbed into their departments.

46.     On November 15, 2022, Phase 2 of the Silver Line Rail Project opened to riders.

47.     On January 24, 2023, MWAA held a meeting during which HR announced the layoff or "Reduction in Force" (RIF) of Rail Project staff, some as early as March 10, 2023.

48.    At the January 24, 2023 meeting, Mr. Crehan received a notice of RIF effective March 10, 2023. He received a final paycheck and 10 weeks' severance on the next pay date, which was March 21, 2023.

49.    Throughout his employment, and as evidenced by a memorandum dated December 26, 2019, and an email to Ms. Spera dated July 8, 2022, Mr. Crehan gave proper and unrefuted advice with respect to MWAA's legal and ethical obligations. In response, MWAA senior managers including its CEO and its head of Procurement refused to work with him, avoided speaking to him, circumvented him on issues directly related to his job, and undermined him with Rail Project staff.

50.    Mr. Crehan was not terminated for cause, or for any performance-based reasons. Mr. Crehan was terminated in retaliation for his proper advice. Including Mr. Crehan in the RIF was nothing more than a pretext for MWAA to attempt to cover up its retaliatory termination of Mr. Crehan.

51.    Mr. Crehan's termination was surprising and puzzling. First, MWAA had promised, and it was a fundamental part of Mr. Crehan accepting employment, that he would remain in the Legal Department upon completion of the Rail Project. Second, his termination came at a time when MWAA needs lawyers with Mr. Crehan's experience (and especially with his track record of excellent performance reviews) as it begins to rework its real estate holdings and launches billions in new construction. MWAA recently began a multi-billion dollar construction program including two new terminals and completion of the Dulles passenger tram system – the very same type of work Mr. Crehan had been doing for the past 10 years, and for which he was more than qualified. That construction program requires people to do the same kinds of work as the people MWAA is laying off, including Mr. Crehan.

52.    In addition, Mr. Crehan's termination is in violation of MWAA's written "Reduction in Force" policy, which states that before a person can be laid off, that person's VP/GC must find that there are one or more excess positions with that title, and then lay off holders of that position, based on a formula that, for the legal group, amounts to seniority. Mr. Crehan had the most seniority in the group. If MWAA followed its written policy, the other four Associate General Counsel would have been targeted for layoff before Mr. Crehan.[3]

53.    Although MWAA contends that it is following its RIF policy, even Ms. Spera has declined to defend MWAA's interpretation of the RIF policy, and instead, has avoided and refused to discuss it with Mr. Crehan, asserting that she has not looked at the policy closely, and that "HR controls that decision."

54.    When Mr. Crehan emailed Anthony Vegliante, SVP for HR, asking him to explain where he, Mr. Crehan, had misunderstood the policy, Mr. Vegliante refused to respond and directed a subordinate, Robin Wade, to tell Mr. Crehan that he could be laid off because his "employer" is the accounting category for Rail Project spending. Mr. Crehan replied by explaining that his employer is MWAA and again requesting a response in terms of the written RIF policy. HR did not respond.

55.    MWAA's intentional and flagrant violation of its own RIF policy reflects MWAA's retaliation against Mr. Crehan for his proper advice.

---

[3] MWAA Layoff and Reduction-in-Force (RIF) Directive, September 2020, § 5.4: "The Labor and Employee Relations Department shall designate the employees affected by the Layoff or RIF on the Retention Register in inverse order of their ranking (bottom first) until the required number of jobs is reached. If two or more employees have the same total retention score, the most junior employee is designated as affected by the Layoff or RIF before the others."

## COUNT ONE –
### RETALIATION AND RETALIATORY TERMINATION IN VIOLATION OF VIRGINIA WHISTLEBLOWER PROTECTION LAW, VA. CODE § 40.1-27.3

56.   The foregoing allegations are incorporated as if realleged herein.

57.   The Virginia whistleblower protection law, House Bill 798, signed in to law on April 11, 2020 protects an employee who, "in good faith reports a violation of any federal or state law or regulation to a supervisor . . ." or "[r]efuses to engage in a criminal act that would subject the employee to criminal liability .. . ." and prohibits an employer from discharging, disciplining, threatening, discriminating against, or penalizing an employee, or taking other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee made any such report or refused to engage in any such conduct.

58.   Mr. Crehan is a resident and citizen of the Commonwealth of Virginia, and as such, held the rights guaranteed by the Virginia whistleblower protection law.

59.   Mr. Crehan's right to report potential serious violations of state or federal law and/or regulations and/or ethical violations that would lead to violations of state or federal law, is clearly established under relevant law.

60.   During the course of his employment, Mr. Crehan consistently advised MWAA management about the proper use of Rail Project funds in compliance with federal and state regulations pertaining to use of government funds, as well as MWAA's own Code of Ethics which states MWAA's duty and commitment to act impartially, with integrity, and in the best interests of the people of the D.C. Metropolitan area.

61.   Mr. Crehan's relevant advice included, but was not limited to, written memos to MWAA's then-General Counsel in December 2019 and July 2022.

12

62.     MWAA's Code of Ethics requires employees to report any good-faith belief that an ethics violation was occurring.

63.     Around July 2022, Ms. Spera told Mr. Crehan that his discussion of the best results MWAA might achieve against contractor claims was unwelcome, but did not state that the advice was incorrect. Ms. Spera stated specifically that Mr. Crehan's advice with respect to a particular contractor claim "made people [senior management] angry."

64.     In retaliation for Mr. Crehan's position, MWAA engaged in a course of retaliation against Mr. Crehan, in order to excuse his eventual termination at the end of the Rail Project (his intimate knowledge of the construction contract, and the requirements for turnover to WMATA, was indispensable until completion).

65.     As the Rail Project neared completion, when approximately eight other team members were reabsorbed into their departments, Mr. Crehan was terminated, in violation, and without regard to MWAA's written "Reduction in Force" policy.

66.     Although MWAA contends that it was following its RIF policy, even Ms. Spera has declined to defend MWAA's interpretation of the RIF policy, and instead, avoided and refused to discuss it with Mr. Crehan, with the excuse that she had not looked at the policy as closely as had Mr. Crehan, and "HR controls that decision." Notably, Ms. Spera, who was Mr. Crehan's predecessor as Rail Project attorney, had returned to MWAA's General Counsel office at Reagan National Airport when her tenure as Rail Project attorney ended.

67.     When Mr. Crehan emailed HR asking how his interpretation of the RIF policy was incorrect, Mr. Crehan was told that he could be laid off because his "employer" is the accounting category for Rail Project spending. (MWAA accounts for toll road and rail activities separately from airport activities.) The statement that Mr. Crehan's employer is not MWAA is false, as Mr.

13

Crehan is an employee of MWAA's Legal Department, and HR did not offer any response when Mr. Crehan pointed this out.

68.   MWAA's intentional and flagrant violation of its own RIF policy reflects MWAA's retaliation against Mr. Crehan for his position with respect to actions by MWAA's leadership.

69.   The adverse actions taken against Mr. Crehan were retaliatory and entirely unjustified and unwarranted based on his performance.

70.   MWAA's retaliation, including retaliatory termination, against Mr. Crehan led to economic damages, loss of benefits, significant emotional distress and public and amount to professional disparagement.

71.   By retaliating against Mr. Crehan, MWAA exhibited an extreme reckless disregard of, and callous indifference to, his rights under Virginia law.  Defendant's actions described above were in willful and wanton disregard of Plaintiff's rights, and taken in order to specifically to injure him for his position with respect to MWAA's actions.

72.   Mr. Crehan suffered harm as a result of MWAA's retaliation and retaliatory termination, including loss of advancement and career opportunities and the attendant employment benefits.

73.   As a direct and proximate result of Defendant's conduct, Mr. Crehan has suffered, and will in the future suffer, great damage including loss of past and future income, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, anxiety, insomnia, loss of confidence, embarrassment, professional disparagement, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

14

74. Pursuant to Va. Code § 40-1-27.3(C), Mr. Crehan is entitled to injunctive relief, reinstatement, restoration of lost benefits, back pay for lost wages, bonus pay, compensatory damages, and litigation costs including attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MICHAEL T. CREHAN requests that this Court enter judgment in his favor, against the Defendant, METROPOLITAN WASHINGTON AIRPORTS AUTHORITY on the above Count; and further:

(a) Award Mr. Crehan compensatory damages to be determined by a jury, and in no event to exceed Ten Million Dollars ($10 million), plus demonstrated past and future pecuniary damages on the above-stated Count (including pre-judgment interest); and in addition

(b) Award Mr. Crehan reinstatement of his position, back pay, interest on the back pay, and compensation for any damages sustained because of the retaliation on the above stated Count; and in addition

(c) Award Mr. Crehan an injunction prohibiting MWAA from further engaging in the illegal practices that have deprived Mr. Crehan of his pay and benefits; and in addition

(d) Award Mr. Crehan attorneys' fees and costs, and such other and further relief as may be appropriate under the circumstances.

## JURY DEMAND

**PLAINTIFF MICHAEL T. CREHAN DEMANDS A TRIAL BY JURY.**

June 13, 2023

Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, VSB 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
 BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Michael T. Crehan*

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR ARLINGTON COUNTY

| | | |
|---|---|---|
| MICHAEL T. CREHAN | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Case No. CL 23-2380 |
| | : | |
| METROPOLITAN WASHINGTON | : | |
| AIRPORTS AUTHORITY, | : | |
| | : | |
|     Defendant. | : | |

### DEFENDANT'S DEMURRER AND PLEA IN BAR TO COMPLAINT

COMES NOW, Defendant Metropolitan Washington Airports Authority ("Airports Authority" or "MWAA"), by counsel, pursuant to Rule 4:15 of the Rules of the Supreme Court of Virginia and Section 8.01-273 of the Annotated Code of Virginia, and files this Demurrer and Plea in Bar to Plaintiff Michael T. Crehan's ("Crehan") Complaint. In support thereof, the Airports Authority states as follows:

### DEMURRER

## I.    INTRODUCTION

Crehan, an attorney formerly employed by the Airports Authority in connection with the expansion of Metrorail to Washington Dulles International Airport, was laid off, along with other employees dedicated to the Metrorail project, in a "reduction in force" at the conclusion of the project when the operation of the Metrorail extension was turned over to the Washington Metropolitan Area Transit Authority ("WMATA"). It was always the Airports Authority's understanding and intention to lay off employees hired for the Metrorail project at the conclusion of the project, which the Airports Authority is privileged to do as all such employees were employed "at will." Crehan, however, alleges that his inclusion in the "reduction-in-force" was

pretext for unlawful whistleblower retaliation under Va. Code Ann. § 40.1-27.3.  In support of this claim, Crehan asserts that he "raised concerns" about whether payments made by the Airports Authority in settlement with construction contractors were "properly justified," and that "throughout his employment, and as evidenced by a memorandum dated December 26, 2019, and an email to Ms. Spera[1] dated July 8, 2022, Mr. Crehan gave proper and unrefuted advice with respect to MWAA's legal and ethical obligations."  *See* Complaint, ¶¶ 41, 49.[2]  However, as will be further discussed below, neither these allegations, nor any other allegation set forth in Crehan's Complaint, state a claim upon which relief can be granted under Va. Code Ann. § 40.1-27.3, and the Airports Authority's Demurrer should be sustained.

## II.    STANDARD

A demurrer tests the sufficiency of the plaintiff's factual allegations to determine whether the complaint states a cause of action.  *See* *Fun v. Virginia Military Institute*, 245 Va. 249, 252

---

[1] Johnna Spera is the Airports Authority's Senior Vice President & General Counsel, and oversees all legal matters for the Airports Authority.

[2] The Airports Authority does not concede that any "advice" Crehan gave to it was "proper and unrefuted" as he alleges.  Further, Crehan may not properly rely upon the memorandum of December 26, 2019 as protected whistleblower activity, as this memorandum is dated many months before passage of Va. Code Ann. § 40.1-27.3.  Moreover, as more than three years elapsed between submission of this memorandum and the personnel action which Plaintiff challenges, there can be no nexus between Crehan's 2019 memorandum and the reduction-in-force.  For an inference of causation to arise, the time between the protected activity and the adverse action is measured in months not years.  Where a plaintiff is attempting to infer a causal link based only upon the temporal proximity between the protected activity and the adverse employment action, the time period between the protected activity and the consequences must be very short, i.e. less than three months.  *See* *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (noting that temporal proximity must be "very close" and concluding that a gap of twenty months between Plaintiff's EEOC charge and her firing is indicative of the lack of causal connection); *Pepper v. Precision Valve Corp.*, 526 Fed. App'x 335, 337 (4th Cir. 2013) (finding 10-month gap between alleged protected activity and adverse employment action is too long to establish causal connection); *Jones v. Best Buy*, 2016 WL 6471256, at *4 (W.D. Va. Nov. 1, 2016); *King v. Pulaski City. Sch. Bd.*, 195 F. Supp. 3d 873, 885–86 (W.D. Va. 2016).

(1993).  If a complaint, considered in the light most favorable to the plaintiff, fails to state a valid cause of action, a demurrer should be sustained.  *See* *Luckett v. Jennings*, 246 Va. 303, 307 (1993).  Although Virginia is a "notice pleading" jurisdiction, to survive demurrer, "a complaint must still contain sufficient allegations of material facts to inform a defendant of the nature and character of the claim."  *Preferred Systems Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 407 (2012).  Mere speculation or "conclusory assertions" will not be sufficient for a complaint to survive demurrer.  *See* *Id.*

## III.    ARGUMENT

### A.    Under federal law, the Airports Authority is not subject to Va. Code Ann. § 40.1-27.3.

The Airports Authority is an interstate compact agency created pursuant to a compact ("Compact") between the Commonwealth of Virginia and the District of Columbia, and approved by the United States Congress pursuant to the Compact Clause of the United States Constitution, Art. I, sec. 10, cl. 3 (the "Compact Clause").  Under well-established federal law, interstate compact agencies, including the Airports Authority, are not subject to the unilateral control of the parties to the interstate compact.  In determining whether particular state statutes apply to compact agencies generally, and to the Airports Authority in particular, the touchstone is the language of the Compact.  A state statute only applies if the interstate compact contains language reserving the right of the compacting states to regulate the compact agency on the matter in dispute.  The Airports Authority Compact does not authorize the Commonwealth to regulate the Airports Authority on matters relating to its employees' whistleblower complaints. Therefore, Va. Code Ann. § 40.1-27.3 does not apply to the Airports Authority and Crehan may not maintain a cause of action arising under that statute.

The Airports Authority, by the terms of the Compact, is "independent of the Commonwealth and its local political subdivisions."  Va. Code Ann. § 5.1-156 (B); D.C. Code § 9-905(b).  The Compact unambiguously grants the Airports Authority the power to "employ, *in its discretion*, consulting engineers, *attorneys*, . . . and other such employees and agents as may be necessary, and to fix their compensation and benefits" and to do all things "necessary and convenient to carry out these powers."  Va. Code Ann. §§ 5.1-156 (10), (16) (emphasis added).  Thus, the Airports Authority has been granted the exclusive power to determine what whistleblower protections, if any, should be established for its employees.  Since Virginia did not reserve the right to impose its employment laws generally, or its whistleblower laws in particular, upon the Airports Authority, this Court has no jurisdiction over the Airports Authority on a cause of action arising under Va. Code Ann. § 40.1-27.3.

As a matter of federal law, which applies here[3], the Airports Authority is not subject to Va. Code Ann. § 40.1-27.3 because one signatory to an interstate compact cannot unilaterally impose its enactments upon the compact agency.  <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 402 (1994) ("bi-state entities created by compact, however, are not subject to the unilateral control of any one of the States . . . .").  In entering into an interstate compact, a state cedes a portion of its authority to the interstate compact agency, and may not impose state law on a compact agency unless it is reserved in the compact.  <u>See</u> Litwak & Mayer, "Developments In Interstate Compact Law And Practice 2020," 51 Urb. Law. 99, 110-11 (July 2021).

---

[3] Because the compact creating the MWAA was congressionally sanctioned in accordance with the Compact Clause, it is a federal law subject to federal construction, notwithstanding its genesis in the enabling acts of Virginia and the District of Columbia.  <u>See</u> <u>Parkridge 6 LLC v. U.S. Dep't of Transp.</u>, 2010 WL 1404421, at *6 (E.D. Va. 2010) (citing <u>New Jersey v. New York</u>, 523 U.S. 767, 811 (1988)).

4

A recent decision of the United States District Court for the Eastern District of Virginia, _MWAA v. Gary Pan, Comm'r of Va. Dep't of Labor and Industry,_ 2023 WL 4203434 (E.D. Va. June 27, 2023; notice of appeal filed July 26, 2023) (attached) cogently explains the breadth of the Airports Authority's immunity from the Commonwealth's labor laws, in holding that Virginia's occupational safety and health regulations authorized under Va. Code Ann. § 40.1-22 -- the same Title, Chapter and Article of the Virginia Code as Va. Code Ann. § 40.1-27.3 -- did not apply to the Airports Authority.  The U.S. District Court held that in creating the Airports Authority as an interstate compact agency, the Commonwealth "unambiguously surrendered its unilateral regulatory authority with respect to its occupational safety and health laws." _Id._ at *2. The Court found that MWAA's authority is governed under the terms of the Compact and since the "MWAA Compact is silent as to the authority of the states to enforce their labor laws . . . [Virginia] voluntarily surrendered its ability to exercise unilateral regulatory authority over MWAA's facilities." _Id._ at *3.  The Court noted that the Compact contained provisions indicating that the Commonwealth was aware of how to maintain concurrent power over Airports Authority facilities, but "it did not include a similar provision expressing its maintenance of regulatory authority over labor conditions." _Id._  Applying contract principles, the Court held that "this omission suggests that Virginia purposefully surrendered its unilateral regulatory authority over labor issues." _Id._  Once surrendered, the Commonwealth "may not regain that unilateral regulatory authority . . . unless it had reserved its authority over a particular domain in the Compact." _Id._  The Court found that the plain language of the Compact indicates that Virginia and the District intended to cede their unilateral regulatory authority.  _Id._  The Court also noted that approval of a compact "settles the line or original right; it is the law of the case binding on the states and its _citizens._" _Id. citing Corr v. MWAA_, 800 F. Supp. 2d 743, 758

(E.D. Va. 2011) (emphasis added).  The Court further held that the Airports Authority Compact

is the law of the United States, which preempts conflicting state laws under the Supremacy

Clause.  *Id.*

Like the United States District Court in *MWAA v. Pan*, the Circuit Court for Loudoun

County also held that:

> the provisions of the [Compact] enjoy supremacy over inconsistent state statutory and constitutional mandates and must be interpreted in light of federal law. *WMATA v. One Parcel of Land*, 706 F.2d 1312 (4th Cir.1983).  Furthermore, the Court believes that the provisions of the . . . [Compact] must be harmonized within the context of the legislative history giving rise to the creation of [MWAA].  Thus, the grant contained in the Virginia enabling act . . .  contains the grant of the power to [MWAA], which Congress later approved in accordance with its constitutional right of review.  Once approved, the delegation became a matter of federal law not subject to state constitutional restrictions. The terms of the compact cannot be modified unilaterally by state legislation and take precedence over conflicting state law.

*Fairchild Corp. v. MWAA*, 1999 WL 600526, at *5 (Loudoun Cir. Ct.1999).

The Virginia Attorney General took this same position when opining that the Virginia

Freedom of Information Act ("FOIA") did not apply to the Airports Authority.  In Attorney

General Opinion No. 11-004, Honorable Robert G. Marshall, 2012 WL 2063668 (May 25,

2012), Attorney General Cuccinelli, relying in part upon *C. T. Helmuth & Associates*, *infra*,

noted that under federal law, which applies to interstate compacts, state statutes do not apply to

interstate compact agencies unless the compact has reserved to the compacting states the power

to apply such statutes to the compact agency.  The Attorney General found that the Airports

Authority Compact does not specify that the Virginia FOIA applies to MWAA and therefore

MWAA was not subject to the statute.  The Attorney General's opinion is entitled to due

deference from Virginia courts, particularly as here where the General Assembly has known of

the Attorney General's Opinion for many years and has declined to review the decision.  This

inaction evinces legislative acquiescence in the interpretation of the Attorney General. *Beck v. Shelton*, 267 Va. 482, 491-92 (2004).

These same principles have been applied in numerous cases involving WMATA, which is an interstate compact entity created by the District of Columbia, Maryland and the Commonwealth of Virginia to operate the Metrorail and Metrobus systems. Among the most relevant of these cases to this matter is *Slack v. WMATA*, 325 F. Supp. 3d 146, 155-158 (D.D.C. 2018), which held that WMATA is not subject to the District of Columbia Whistleblower Protection Act, stating that "one signatory may not impose its legislative enactment upon the entity created by it without the express consent of the other signatories and the Congress of the United States." Similarly, the U.S. District Court for Maryland has held that WMATA is exempt from the Maryland Public Information Act on the basis of this principle. That court held:

> when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. It, therefore, appears settled that one party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories. . . plainly Maryland may not impose its preferences in this regard upon Virginia and the District for such an imposition, however minimal is nonetheless an intrusion upon their interests and in derogation of the compact. Clearly then, Maryland may not unilaterally subject WMATA to the provisions of Art. 76A . . .

*C.T. Hellmuth & Associates v. WMATA*, 414 F. Supp. 408, 409-10 (D. Md. 1976).

The Commonwealth of Virginia and the District of Columbia included provisions in the Compact that expressly cede portions of their sovereignty to the Airports Authority and restrict the application of either party's laws to MWAA without the other's concurrence. Among the relevant portions of the Compact which demonstrate the unambiguous surrender of sovereignty on this subject are: Section 5.1-156 (A) (10), which grants MWAA the power to "employ, in its discretion" attorneys and other employees and agents needed, and to establish their compensation and benefits; Section 5.1-156 (A) (16), which grants it the power "to do all acts

and things necessary or convenient to carry out the powers expressly granted in th[e Compact];"
Section 5.1-156 (B), which specifies that MWAA "shall be independent of the Commonwealth
and its local political subdivisions, the District of Columbia and the federal government in the
performance and exercise of the airport-related duties and powers enumerated" in the Compact;
and Section 5.1-175, which requires that the Compact, being necessary for the welfare of the
inhabitants of the Commonwealth, be liberally construed to effect its purposes. These provisions
clearly indicate that Virginia has ceded its powers with regard to employment protections to
MWAA. Just as Judge Nachmanoff held that the Virginia Department of Labor and Industry is
enjoined from enforcing any of its occupational safety and health regulations under the Virginia
labor code against the Airports Authority, so too is Crehan foreclosed from bringing this action
against the Airports Authority under the Virginia labor code.

**B. Even if this Court concludes that Va. Code Ann. § 40.1-27.3 applies to the Airports
Authority, Count I (Retaliation and Retaliatory Termination in Violation of
Virginia Whistleblower Protection Law, Va. Code § 40.1-27.3) of the Complaint
must be dismissed for failure to state a claim upon which relief can be granted.**

**i. Crehan's Complaint does not identify the alleged federal or state law or
regulation that was allegedly violated.**

As noted above, Crehan's sole cause of action pled in this case arises under of Va. Code
Ann. § 40.1-27.3, and specifically under subsections (A) (1) and (3). *See* Complaint, ¶ 57. With
regard to subsection (A) (1), the Code of Virginia states that,

> An employer shall not discharge…or penalize an employee, or take other retaliatory
> action regarding an employee's compensation, terms, conditions...or privileges of
> employment, because the employee: (1) ...in good faith reports *a violation of any federal
> or state law or regulation* to a supervisor or to any governmental body or law-
> enforcement official.

Va. Code Ann. § 40.1-27.3 (A) (1) (2023) (emphasis added).

Courts that have analyzed demurrers to Complaints under Va. Code Ann. § 40.1-27.3 have found that a lack of specific allegations regarding the law or regulation violated dooms the Complaint. In the recent decision of _Markley v. Liberty Univ._, the Circuit Court for the City of Lynchburg found that the allegations raised by that plaintiff were not sufficient to state a claim upon which relief could be granted. _See Markley v. Liberty Univ._, 2023 Va. Cir. LEXIS 63 (City of Lynchburg, April 17, 2023). The Circuit Court in _Markley_ noted that the plaintiff's complaint in that case alleged that he made "repeated good faith reports of disturbing violations and potential violations of state and federal laws," of "foul play," "troublesome concerns," and that the Complaint contained a lengthy list of allegedly "improper" activities, but none of this was sufficient to state a claim under Va. Code Ann. § 40.1-27.3 (A) (1). _Id._ at pp. *3 - *5. In sustaining the defendant's demurrer, the Court noted that the allegations contained within Markley's complaint regarding improper activities were limited to "conclusory assertions," and that the complaint did not contain any "factual assertions as to what improper activities he reported and . . . as to who at Liberty may have acted improperly." _Id._ at *5 - *6.

The Circuit Court for Hanover County found similarly. In the case of _Chenault v. RBI Corp._, the Court sustained a demurrer to a complaint under Va. Code Ann. § 40.1-27.3 (A) (1), finding that "voicing concerns" or "objecting to a cavalier attitude" as was alleged in the complaint do not amount to reporting violations of federal or state laws or regulations. _See Chenault v. RBI Corp. Chenault v. RBI Corp._, 108 Va. Cir. 529, 530 - 31 (Hanover 2021).

When the United States District Court for the Eastern District of Virginia recently examined the issue of whether a plaintiff's pleading had alleged sufficient facts to state a claim under Va. Code Ann. § 40.1-27.3 (A) (1), that complaint was also found to be deficient. In the case of _Colquitt v. Bon Secour Mercy Health_, the U.S. District Court found that the complaint's

9

allegations that two employees of the defendant had engaged in "unethical practices" and outright "misconduct" were insufficient to state a claim under Va. Code Ann. § 40.1-27.3 (A) (1).  *See* *Colquitt v. Bon Secour Mercy Health*, 2022 U.S. Dist. LEXIS 28308, *10 – 12 (E.D. Va. Feb. 16, 2022).  Finding that allegations of misconduct and ethical violations did not equate to a "violation of any federal or state law or regulation" as the Virginia Code required, the Court granted defendant's Motion to Dismiss.  *Id.*

Similar to the complaints at issue in the above-cited cases, Crehan's Complaint has failed to identify a single federal or state law or regulation that has allegedly been violated by anyone at the Airports Authority.  Instead, much as with the plaintiffs referenced in the cases above, Crehan merely alleges that he "raised concerns" about certain payments made to contractors in the settlement of outstanding claims or to satisfy change orders, and that he "gave proper and unrefuted advice with respect to MWAA's legal and ethical obligations."  *See* Complaint, ¶¶ 41, 49.  Crehan's Complaint, despite containing numerous and lengthy factual allegations, does not specify any other conduct which he alleges was protected under Va. Code Ann. § 40.1-27.3 (A) (1).  Neither of these allegations allege that any federal or state law or regulation was violated by the Airports Authority.  Raising "concerns" and giving advice about "legal and ethical obligations," hardly amounts to reporting violations of a federal or state law or regulation.  As such, Crehan's Complaint fails to state a claim upon which relief can be granted and should be dismissed.

> ii. **Crehan's Complaint fails to state a claim under Va. Code Ann. § 40.1-27.3 (A) (1) because his alleged "reports of violations" were within his normal duties as an attorney for the Airports Authority.**

Crehan's Complaint fails to state a claim under Va. Code Ann. § 40.1-27.3 because the alleged reports of potential violations were within his normal duties, and thus the Airports

Authority could not have unlawfully retaliated against him for simply doing what he was expected to do. In this way, the present action is similar to a case recently decided in the United States District Court for the District of Columbia.

In *United States ex rel. Charles Hutchins and Joyce Subhi v. DynCorp Intn'l Inc.*, 342 F.Supp.3d 32 (U.S.D.C. 2018), the U.S. District Court dismissed plaintiffs' retaliation claims under the False Claims Act, finding that the defendant could not have retaliated against the plaintiffs because it could not know plaintiffs' actions were those of whistleblowers when plaintiffs were merely performing their regular job duties. Plaintiffs, who were both contract managers for DynCorp (and also happened to be attorneys), alleged that DynCorp retaliated against them by firing them for whistleblowing when they reported a variety of issues and concerns with DynCorp's handling of several contracts with the United States. *Id.* at 36 – 45. Finding that Plaintiff Hutchins alleged that his investigation and reporting of wrongful conduct was performed within his regular job description, the Court concluded that Hutchens' argument was essentially that the performance of his normal job duties, in and of itself, constituted protected activity. *Id.* at 60. This, the Court concluded, could not constitute protected whistleblowing, because,

> ...without evidence that the employee expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job, an employer could not be on notice that the employee was acting in in furtherance of a [False Claims Act] action. No matter how harsh its actions, without such notice, DynCorp could not have the intent to retaliate against Mr. Hutchins for engaging in protected activity...

*Id.* at 60 *citing United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1260 – 61 (D.C. Cir. 2004).

In further support of its conclusion that Hutchins had not stated a claim for whistleblower retaliation, the U.S. District Court noted that Hutchins did not "step outside the usual chain of

command to express his concerns." _Id._ at 60.  Merely complying with his "day-to-day job duties of reviewing DynCorp's compliance with regulatory and contractual requirements did not automatically grant protected status to any noncompliance [Hutchins] may have discovered." _Id._ at 61.

Crehan's claims are strikingly similar to those of Hutchins.  Indeed, attorneys, like Crehan, are expected to provide advice related to potential legal and ethical concerns as a routine part of their job responsibilities.  Crehan's Complaint does nothing more than establish that he was an attorney for the Airports Authority and, in that capacity, provided advice on claims related to the construction of the Rail Project.[4]  Crehan states that he advised the General Counsel of potential legal or ethical issues related to the Rail Project, and did so throughout his tenure as an expected part of his job.  Complaint, ¶¶ 60, 61.  Crehan's Complaint demonstrates, through repeated statements, that he routinely advised senior leadership, including the General Counsel, on legal matters related to contractor claims, and Crehan notably characterizes the December 26, 2019 memo and July 8, 2022 email as "evidence" of the type of advice he regularly gave "throughout his employment."  Complaint, ¶¶ 34, 36, 38, 49, 60, 61.  Attorneys cannot be engaged in protected whistleblower activity any time they provide legal advice. Without more, the Airports Authority could not have known that Crehan was engaged in protected whistleblowing, and not merely acting in his capacity as counsel.  And without such notice of whistleblowing, it is a legal impossibility that the Airports Authority could have retaliated against Crehan when it terminated his employment as part of the reduction-in-force.

---

[4] Indeed, should he be permitted to proceed in this action, Crehan's prosecution of his case will inevitably involve confidential and privileged matters and discussions, including those protected by the attorney/client privilege.

As such, Crehan's Complaint has failed to state a claim upon which relief can be granted, and the Airports Authority's Demurrer should be sustained.

### iii. Crehan has not alleged any facts that demonstrate he was retaliated against for refusing to engage in a criminal act that would have subjected him to criminal liability.

In addition to claiming that his actions are entitled to protection under Va. Code Ann. § 40.1-27.3 (A) (1) for reporting violations of federal and state law or regulation, Crehan's Complaint seems to allege that he is entitled to the statute's protection because he refused to engage in criminal acts that would have subjected him to criminal liability under Va. Code Ann. § 40.1-27.3 (A) (3).  *See* Complaint, ¶ 57.  However, other than merely quoting Va. Code Ann. § 40.1-27.3 (A) (3) in paragraph 57 of the Complaint, Crehan's Complaint is devoid of any factual allegation that he refused to do anything that was criminal or that would have subjected him to criminal liability.  Without any such factual allegations to support such a claim, Crehan's Complaint is deficient under Va. Code Ann. § 40.1-27.3 (A) (3), and the Airports Authority's Demurrer should be sustained.

### iv. The Airports Authority is not an "employer" under Va. Code Ann. § 40.1-27.3.

As has been referenced above, Va. Code Ann. § 40.1-27.3 only applies to an "employer." *See* Va. Code Ann. § 40.1-27.3 (A).  The term "employer" for purposes of this statute is defined in Va. Code Ann. § 40.1-2.  In that statutory section, the General Assembly defines "employer" as,

> ...an *individual, partnership, association, corporation, legal representative, receiver, trustee, or trustee in bankruptcy* doing business in or operating within this Commonwealth who employs another to work for wages, salaries, or on commission and shall include any similar entity acting directly or indirectly in the interest of an employer in relation to an employee.

Va. Code Ann. § 40.1-2 (2023) (emphasis added).

13

The Airports Authority, however, is none of the entities listed in § 40.1-2's definition of "employer." Indeed, as discussed previously, the Airports Authority is an interstate compact agency, created as a "public body corporate and politic" by interstate compact between the Commonwealth of Virginia and the District of Columbia, with the consent of the United States Congress. Va. Code Ann. § 5.1-153; D.C. Code § 9-902. Since the Airports Authority is not an "employer" as defined by Va. Code Ann. § 40.1-2, Va. Code Ann. § 40.1-27.3 does not apply to its employees and its Demurrer to Crehan's Complaint should be sustained. *See Jordan v. School Board of City of Norfolk*, 2022 U.S. Dist. LEXIS 204781, *37 - *42 (E.D. Va. Nov. 9, 2022) (holding that claim under Va. Code Ann. § 40.1-27.3 could not lie against defendant where defendant was not a type of entity included within the definition of "employer" under the statute).

**C. Crehan's claim for $10 Million in compensatory damages, unspecified "past and future pecuniary damages" and claim for compensatory damages related to his retaliation claim, should be stricken from the Complaint because such damages are not available under Va. Code Ann. § 40.1-27.3.**

A court *may* order that a prevailing plaintiff under Va. Code Ann. § 40.1-27.3 is entitled to: (1) an injunction to restrain continued violation of the statute; (2) reinstatement to the same position held before the retaliatory action was taken, or to an equivalent position, and/or; (3) "compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs." *See* Va. Code Ann. § 40.1-27.3 (C) (2023). There are no other damages permitted under the statute. Crehan, however, believes he is entitled to inflated amounts beyond what the statute would permit.

Although paragraphs b, c, and d of the "Prayer for Relief" in Crehan's Complaint largely track the damages permitted under Va. Code Ann. § 40.1-27.3 (C), in paragraphs a and b, he also asks for general compensatory damages in the amount of $10 Million, unspecified "demonstrated

14

past and future pecuniary damages," and "compensation for any damages sustained because of the retaliation on the above stated Count."  _See_ Complaint, ¶ 74 and p. 15.  The statute does not permit the recovery of general compensatory damages, "past and future pecuniary damages," or damages for retaliation.

Examining a similar claim for general compensatory damages far exceeding what the statute permits, the Circuit Court for the City of Lynchburg concluded they were not recoverable under the statute.  _See Markley_, 2023 Va. Cir. LEXIS at *12 - * 23.  In _Markley_, the plaintiff's complaint requested compensatory damages of $20 Million, in addition to those items of damages permitted by the statute, such as lost wages and benefits, an injunction and attorneys' fees.  _Id._ at *12 - *13.  Markley argued that the term "remuneration" in the statute permitted the recovery of general compensatory damages.  The Court disagreed.

Beginning with an examination of statutory construction, the Circuit Court noted the first step is to ascertain and give effect to the legislative intent, where the language is unambiguous, by giving the words used in the statute their plain meaning, unless it is apparent that the legislative intent is otherwise.  _Id._ at *13 - *14 citing _Blake v. Commonwealth_, 288 Va. 375, 381 (2014); _Phelps v. Commonwealth_, 275 Va. 139, 142 (2008).  If the legislature leaves a term undefined, then the court must give the term its ordinary meaning, taking into account the context in which it is used.  _Id._ at *14 citing _American Tradition Inst. v. Rector & Visitors of the Univ. of Va._, 287 Va. 330, 341 (2014).

The Circuit Court further noted that _Black's Law Dictionary_ ("_Black's_") defines "remuneration" as, "payment, reimbursement. Reward; recompense; salary; compensation."  _Id._ at *14 citing _Black's Law Dictionary_ 1296 (6th ed. 1990).  "Recompense" is defined as "A reward or payment for services; remuneration paid for goods or other property."  _Id._ citing

15

*Black's* at 1272.  The Circuit Court concluded, using *Black's* definitions, that "remuneration" in the context of Va. Code Ann. § 40.1-27.3 (C) "seems to be limited to payment, compensation, and reimbursement for services or labor."  *Id.* at *14.

The Circuit Court went on to analyze the term "remuneration" through the statutory construction canons of *ejusdem generis* ("when a particular class of persons or things is enumerated...and general words follow, the general words are to be restricted in their meaning to a sense analogous to the less general, particular words") and *noscitur a sociis* ("when general and specific words are grouped, the general words are limited by the specific and will be construed to embrace only objects similar in nature to those things identified by the specific words").  *Id.* at *16 citing *Sainani v. Belmont Glen Homeowners Ass's, Inc.*, 297 Va. 714, 724 (2019).  Looking at how the term "remuneration" is used in the statute, the Circuit Court concluded that both canons of construction dictated that "remuneration" in the context of Va. Code Ann. § 40.1-27.3 (C) referred to "lost wages" or "benefits," and not to general compensatory damages.  *Id.* at *16 - *17.

Lastly, in its exhaustive analysis, the Circuit Court examined how the term "remuneration" has been used in other statutes, and contrasted that with how the term "damages" has been used in other statutes.  The Circuit Court noted that in every statute that it examined, the term "remuneration" was always associated with, and limited to mean, "compensation for labor or services."  *Id.* at *17.  The term "damages" however, which the General Assembly could have used in Va. Code Ann. § 40.1-27.3 (C) but chose not to, was used much more broadly within the various statutes examined.  *Id.* at *19 - *20.  The Circuit Court concluded that,

> ...the Court must presume that the General Assembly used the term "remuneration" instead of the term "damages" for a reason...Accordingly, the Court finds that the term "remuneration" cannot be construed to include all forms of compensatory damages.

Rather it must be limited to a meaning similar or analogous to payment, compensation, and reimbursement for services and labor.

_Id._ at *22.  Given this, the Circuit Court struck the claim for $20 Million in compensatory damages from Markley's Complaint.

Similarly, this Court should strike the general compensatory damages claim of $10 Million, the unspecified claim for "past and future pecuniary damages" and the claim for damages for retaliation, from Crehan's Complaint.  Both the plain meaning of the statute and any analysis under the well-established principles of statutory construction, as reviewed in depth by the Circuit Court for the City of Lynchburg and discussed above, mandate that the term "remuneration" does not include general compensatory damages, unspecified pecuniary damages or damages for retaliation.  Such damages are simply not available under the statute, and the Airports Authority's Demurrer to this issue should be sustained.

WHEREFORE, for the above good and valid reasons, the Airports Authority respectfully requests that its Demurrer to Crehan's Complaint be sustained, and that Crehan's claim against the Airports Authority be dismissed with prejudice.

## **PLEA IN BAR**

The Airports Authority incorporates the above argument as if set forth in full herein.  For the reasons set forth above in support of the Airports Authority's Demurrer, the Airports Authority submits that its Plea in Bar to Crehan's Complaint should be sustained, and the Complaint dismissed with prejudice.

WHEREFORE, for the above good and valid reasons, the Airports Authority respectfully requests that its Plea in Bar to Crehan's Complaint be sustained, and that Crehan's claim against the Airports Authority be dismissed with prejudice.

Respectfully submitted,

METROPOLITAN WASHINGTON AIRPORTS
AUTHORITY

By:_____
                    Counsel

Of Counsel:

Joseph W. Santini, VSB #47377
Morris Kletzkin, VSB #88181
FRIEDLANDER MISLER, PLLC
5335 Wisconsin Ave., NW, Suite 600
Washington, D.C.  20015
(202) 872-0800
(202) 857-8343 (fax)
jsantini@fmlaw.com
mkletzkin@fmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Demurrer and Plea in Bar was

sent via electronic and first-class mail, postage prepaid, this 28th day of July 2023, to:

Carla Brown, Esq.
Charlson Bredehoft Cohen Brown & Nadelhaft, P.C.
11260 Roger Bacon Dr., Suite 201
Reston, VA 20190
*cbrown@charlsonbredehoft.com*

_____
Joseph W. Santini

V I R G I N I A:

### IN THE ARLINGTON COUNTY CIRCUIT COURT

_____

|  |  |  |
|---|---|---|
| | ) | |
| MICHAEL T. CREHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CL 23-2380 |
| | ) | |
| METROPOLITAN WASHINGTON | ) | |
| AIRPORTS AUTHORITY | ) | |
| | ) | |
| Defendant. | ) | |

_____)

### PLAINTIFF'S RESPONSE TO DEFENDANT'S DEMURRER TO COMPLAINT

Plaintiff Michael T. Crehan, by counsel, hereby responds to the Demurrer of Defendant Metropolitan Washington Airports Authority ("MWAA") to the Complaint, as set forth below.

### RESPONSE

Plaintiff's position is that the Demurrer of Defendant MWAA is moot because Plaintiff is seeking leave to file an Amended Complaint. Defendant's position – to which Plaintiff strongly objects - is that the amendment should not be had. Should the Court find in favor of the Defendant on this issue, Plaintiff will respond more fully to the demurrer to the initial Complaint.

Document received by the VA Arlington 17th Circuit Court.

September 29, 2023

Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, VSB 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
 BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA  20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Michael T. Crehan*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2023, the foregoing was filed and served via the Arlington Circuit Court's TrueFiling electronic filing system, which will send notification of such filing to:

Joseph W. Santini, Esq.
Morris Kletzkin, Esq.
FRIEDLANDER 1MISLER, PLLC
5335 Wisconsin Ave., NW, Suite 600
Washington, D.C.  20015
(202) 872-0800 Telephone
(202) 857-8343 Facsimile
jsantini@fmlaw.com
mkletzkin@finlaw.com

*/S/ CARLA D. BROWN*
Carla D. Brown, VSB 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
 BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA  20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Michael T. Crehan*

Document received by the VA Arlington 17th Circuit Court.

VIRGINIA:

IN THE ARLINGTON COUNTY CIRCUIT COURT

_____
                                        )
MICHAEL T. CREHAN                       )
                                        )
       Plaintiff,                       )
                                        )
              v.                        )        Case No.  CL 23-2380
                                        )
METROPOLITAN WASHINGTON                 )
  AIRPORTS AUTHORITY                     )
                                        )
       Defendant.                       )
_____)

## AMENDED COMPLAINT

COMES NOW THE PLAINTIFF, MICHAEL T. CREHAN, by counsel, and moves this Court for entry of judgment in his favor, and against the Defendant, METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, and in support of such Amended Complaint alleges and avers as follows:

## NATURE OF ACTION

This action states a claim for retaliation/wrongful termination in violation of Va. Code 40.1-27.3 (the Virginia whistleblower protection law, House Bill 798, signed into law on April 11, 2020 by Virginia Governor Ralph Northam) and the common law of the Commonwealth of Virginia.

## PARTIES

1.     Plaintiff, Michael T. Crehan ("Mr. Crehan"), is a resident and citizen of Fairfax County (Vienna), in the Commonwealth of Virginia.  At all times relevant hereto, Mr. Crehan was employed by Defendant Metropolitan Washington Airports Authority as a member of the

Document received by the VA Arlington 17th Circuit Court.

Legal Department, working out of the Rail Project Office located in Fairfax County, Virginia until 2021 when it moved to offices at Dulles Airport in Loudoun County, Virginia.

2.      Defendant Metropolitan Washington Airports Authority ("MWAA") is headquartered in Arlington County.

3.      MWAA is an independent airport authority, created by interstate compact between the Commonwealth of Virginia and the District of Columbia with the consent of the United States Congress to oversee management, operations, and capital development of the two major airports serving the United States national capital - Ronald Reagan Washington National Airport and Dulles International Airport.

## JURISDICTION

4.      This Court has jurisdiction over Mr. Crehan's claims under the common laws of Virginia and pursuant to Virginia Code § 5.1-173(a).

5.      The amount in controversy exceeds the jurisdictional minimum amount for this Court.

6.      MWAA is headquartered in and regularly conducts business in Arlington County in the Commonwealth of Virginia.

7.      MWAA is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

## VENUE

8.      MWAA is present in and regularly conducts affairs and business activities in Arlington County in the Commonwealth of Virginia, and is headquartered in Arlington County in the Commonwealth of Virginia.

2

Document received by the VA Arlington 17th Circuit Court.

9.     Mr. Crehan was, at all times relevant to the allegations herein, Associate General Counsel and a member of the Legal Department of MWAA.  Mr. Crehan worked out of the Dulles Corridor Metrorail Project Office, located in Fairfax County and then Loudoun County starting in 2021, but reported not to the Rail Project leaders but instead to the MWAA General Counsel and attended weekly staff meetings (either in person or remotely from his office) held in Arlington, with other members of his department located in Arlington County, in the Commonwealth of Virginia.

10.     The majority of the tortious acts and causes of action alleged to have been engaged in, occurred in Arlington County in the Commonwealth of Virginia.

11.     Venue over Mr. Crehan's common law claim is proper under Va. Code 8.01-262(1), (2), (3) and (4).

## BACKGROUND

12.     The Dulles Corridor Metrorail Project Phase 2 is an 11.4-mile extension of the Washington Metropolitan Area Transit Authority's ("WMATA") Silver Line from Wiehle Station through Dulles Airport to eastern Loudoun County (the "Rail Project").  Phase 2 opened service on November 15, 2022.  (Phase 1 opened in July 2014 and connected East Falls Church Station to Wiehle Station.)

13.     The Silver Line was built by MWAA rather than WMATA by agreement among the funding jurisdictions (the United States, the Commonwealth of Virginia, Fairfax and Loudoun Counties, and MWAA) in part because the MWAA-run Dulles Toll Road provided a large share of the funding.  The funding governments agreed that MWAA would manage construction of the project for eventual turnover to WMATA.

Document received by the VA Arlington 17th Circuit Court.

14.    At the inception of MWAA's role managing the Silver Line project around 2005, Jim Bennett, then head of MWAA, announced during an employee meeting that MWAA would build the Silver Line, and that MWAA employees willing to work on Rail Project would remain employed with MWAA after completion of the Rail Project.  This statement by Mr. Bennett was reported to Mr. Crehan by Eric Carey who was present at the meeting.  Mr. Carey was, until his retirement in 2021, the main MWAA Contracting Officer on the Rail Project.  Other employees in addition to Mr. Carey (including Felicia Payne, Pamela Bolls, Anne Field, and Marcia McAllister) also confirmed that MWAA employees dedicated to the Rail Project were told that they would remain MWAA employees after its completion.

15.    Mr. Crehan applied to MWAA based on the same representation that was made to the employees mentioned, as he would not have left his then-current employment for a temporary assignment.  Mr. Crehan learned of the MWAA job opening from then-Associate General Counsel (now, General Counsel), Johnna Spera ("Ms. Spera"), whom Mr. Crehan had worked with at a previous job. At the time of Mr. Crehan's application to MWAA, Ms. Spera was the MWAA attorney located at the Rail Project office.

16.    During Mr. Crehan's hiring interviews, Naomi Klaus (Associate GC) and Phil Sunderland (GC) raised the topic of whether Mr. Crehan was being hired for just the Rail Project. They both confirmed that Mr. Crehan was being hired into the Legal Department and would remain part of the Legal Department of MWAA when the Rail Project was completed.

17.    This was further underscored by the fact that MWAA did sometimes hire "term" employees" (for example, a safety expert) whose employment was expressly for a specific time period established, and sometimes extended, to end with the Rail Project.  Mr. Crehan was not hired as a term employee, or otherwise under those conditions.

4

Document received by the VA Arlington 17th Circuit Court.

18.    Mr. Crehan received an offer letter dated August 28, 2012 for the position of "Associate General Counsel/Business Affairs with [MWAA's] Office of General Counsel at Ronald Reagan Washington National Airport."

19.    The Rail Project office was located on Spring Hill Road in Tysons Corner, and had been established several years prior to Mr. Crehan's hiring, so the offer letter could have – but did not – specify that Mr. Crehan's hiring was for the Rail Project office only.  All official personnel records reflect Mr. Crehan's status as a member of the MWAA Legal Department.

20.    On October 18, 2012, Mr. Crehan received another letter from MWAA regarding his start date.  The letter once again confirmed Mr. Crehan's position to be with MWAA's Office of General Counsel at Reagan National Airport.

21.    In late 2012, Mr. Crehan's predecessor as Rail Project attorney, Ms. Spera, ended her role as Rail Project attorney and returned to MWAA's General Counsel office at Reagan National Airport.

22.    Mr. Crehan's first day of employment with MWAA was October 22, 2012.  He reported to the MWAA office at Reagan National Airport, and the next day began working out of the Rail Project Office in Tysons Corner, Virginia.

23.    In or around 2013, the then-director of the Rail Project, Sam Carnaggio, told Mr. Crehan that because MWAA employees assigned to the Rail Project would need to be reabsorbed when the Rail Project was complete, MWAA minimized the number of such employees by relying heavily on outside contractors to supervise the Rail Project.

24.    Mr. Crehan was never part of the Rail Office, known internally as MA-39, but instead, was always part of the Legal Department, MA-70.  The Legal Department is a separate

Document received by the VA Arlington 17th Circuit Court.

department with its own SVP/General Counsel who reports to the MWAA CEO. The Legal Department includes five Associate General Counsel, including Mr. Crehan.

25.   Throughout his employment, Mr. Crehan frequented the main MWAA Legal Department office at Reagan National Airport on occasion, and for over 10 years, participated in weekly Legal Department meetings, sometimes in person but generally by phone or video conference, with other staff from the Legal Department.

26.   Throughout his employment, the MWAA Legal Department administrative assistant provided administrative support to Mr. Crehan from the main General Counsel office at Reagan National, with respect to department events, continuing legal education, bar dues, annual evaluations, annual goals, and other MWAA-related issues.

27.   Though stationed at the Rail Project office, Mr. Crehan performed his work by connecting remotely to the Legal Department's server, and not the Rail Project office server used by all or virtually all other Rail Project staff.

28.   Mr. Crehan's job description on MWAA's website states that his job is performed in the Legal Department's office, and MWAA's organizational charts (every iteration, for the past 10 years) show that Mr. Crehan reports directly to MWAA's General Counsel (working out of Reagan National), and not to the head of the Rail Project department.

29.   Mr. Crehan was unquestionably an employee of the MWAA Legal Department.

30.   Throughout his employment, Mr. Crehan always received excellent annual performance reviews from the General Counsel. Specifically, Mr. Crehan was rated as "highly effective" and told that he is at the top of the scale for an Associate General Counsel. Mr. Crehan was directly told by the former Chairman of the Board and others (including Charles Stark, SVP

Document received by the VA Arlington 17th Circuit Court.

and Executive Project Director from 2014-2021) that his work was excellent, accurate, respected, ethical, and greatly appreciated.

31.    Similar to the MWAA Contracting Officers who worked in the Rail Office and who retained their jobs in the Procurement department on completion of Rail Project and were not laid off, Mr. Crehan had every reason to expect that he would remain employed with the MWAA Legal Department at the completion of the Rail Project.

32.    Starting in 2013, Mr. Crehan's job involved assisting with the selection (through public procurements) and management of outside counsel and outside claims consultants to help MWAA anticipate and respond to legal claims by the Phase 2 contractors.

33.    On July 26, 2014, Phase 1 of the Rail Project opened to riders.

34.    Starting around 2017, Mr. Crehan's primary work was leading the MWAA team (claims consultant Trauner Consultants and the law firm of Womble Bond Dickinson ("WBD")) to understand, and where appropriate to craft defenses against, contractor claims including the end-of-project claims which had been long threatened, and were eventually made, by HP and CRC.[1]  Mr. Crehan also led the team's determination of MWAA claims against the contractors.

35.    MWAA and its contractors are subject to state and federal false claims statutes applicable to the public funds used to pay for the Rail Project.  MWAA has, in writing, formally taken the position that contractor overcharges may violate such statutes.

36.    MWAA disclosed to the primary rail project contractors the substance of Mr. Crehan's advice against overpayments.

---

[1] Trauner Consultants is prominent claims consulting firm which replaced Delta Consulting in or around 2016 as advisors to MWAA with respect to cost and delay claims by Hensel Phelps Construction Company ("HP") and by Capital Rail Constructors ("CRC"), a joint venture between Clark Construction Group, LLC and Kiewit Infrastructure South Co.

Document received by the VA Arlington 17th Circuit Court.

37.     Mr. Crehan advised MWAA in connection with issues including efforts by MWAA's Phase 2 contractors to obtain the early release by MWAA of "retainage"[2] , the evaluation of claims by the contractors against MWAA, and the evaluation of claims by MWAA against the contractors.

38.     Due to the contractors' defaults, delays, and non-cooperation, MWAA would not have had to pay the amounts in retainage.  As Mr. Crehan warned in a December 2019 memo, releasing this retainage was tantamount to giving away public funds.

39.     The reasons given to Mr. Crehan for the release of retainage were purely private, political reasons.  Mr. Crehan wrote to MWAA leadership, "the Airports Authority has decided for political motives to give project funds to [the contractor] that the Airports Authority has the right to keep, and should keep to protect the public interest."

40.     Mr. Crehan further warned that "spending millions for the benefit of private interests will cause community partners to question our integrity; those community partners include, for example, the Commonwealth of Virginia **to whom the Airports Authority promised to spend grant funds only on what is 'necessary.'**"

41.     Mr. Crehan concluded that the [MWAA] Code of Ethics requires me to report this matter." He further stated that the "release may ***violate rules applicable to recipients of state and federal funding*** since we would be spending money without getting anything in return."

42.     Mr. Crehan also advised that the "***MWAA should examine potential conflicts of interest involving persons pressuring it to make payments it does not owe***." And further, the

---

[2] The portion of the final payment withheld for a defined period to assure a contractor or subcontractor has finished a construction project completely and correctly.

Document received by the VA Arlington 17th Circuit Court.

"funding partners have little or no stake in the political benefits to the Airports Authority of channeling money to [the prime contractor's] subcontractors.

43.     In response to Mr. Crehan memorializing his concerns and his subsequent refusal to approve the payments, MWAA senior managers including its CEO and its head of Procurement refused to work with him, avoided speaking to him, circumvented him on issues directly related to his job, and undermined him with Rail Project staff.

44.     In 2022, MWAA's senior management proposed to enter into global settlements of large rail contractor claims (including claims by the two lead contractors) and MWAA's counterclaims.  Mr. Crehan was the MWAA employee most familiar with the contractors' claims and MWAA's counterclaims.

45.     While the 2022 claims settlement discussions were ongoing, Mr. Crehan worked closely with MWAA managers and advisors including Ms. Spera, Mike Ryan, Bill Manginelli, Eric Carey, and Todd Conley to diligently and properly evaluate the contractors' claims and MWAA's counterclaims.

46.     Mr. Crehan, along with the Trauner Consultants and outside counsel, advised MWAA to reject the contractor claims. This advice was disclosed to the contractors.

47.     MWAA publicly rejected the primary contractor claims on Phase 2. For example, on November 20, 2020 and on April 12, 2022, MWAA issued written decisions that formally rejected the primary contractor claims.  In its well-reasoned and supported decisions, MWAA explained its legal and factual reasoning.

48.     On July 8, 2022, just months before his termination was disclosed, in a memo to Ms. Spera, Mr. Crehan wrote, "Settlement is desirable, but it would be improper for MWAA to pay amounts to [the contractors] that are not owed and cannot honestly be defended as risk-

Document received by the VA Arlington 17th Circuit Court.

based settlements. ***By improper, I mean unethical and conceivably illegal, because any government entity needs proper grounds for the payments it makes***."

49.    On September 8, 2022, the *Washington Post* reported that on July 15, 2022, MWAA agreed to a global settlement with one of the lead contractors.  Earlier, MWAA had entered into a global settlement with the other lead contractor.  The settlements are each embodied in a publicly-available change order signed by MWAA and the respective contractor. These settlements were paid for directly with grant money designated to fund genuine costs of the Rail Project.

50.    Mr. Crehan believed the global settlements with the contractors were unreasonably and unjustifiably high based on the evaluations he, leadership, and outside consultants and attorneys had performed.

51.    In addition, MWAA's early retainage release to one lead contractor was approximately $15 million more than MWAA was required to release.  Later, MWAA's leaders attempted to release an additional $15 million that MWAA was entitled to hold.[3]  MWAA also released to the other lead contractor millions of dollars of retainage not required to be released.

52.    Throughout his employment, and as evidenced by a memorandum dated December 26, 2019, and an email to Ms. Spera dated July 8, 2022, Mr. Crehan gave unrefuted advice with respect to MWAA's legal obligations concerning the settlement payments and release of retainage funds.

---

[3] Funds in retainage can be considered earned because they are a percentage of work done, but the contractor isn't entitled to be paid those funds until certain conditions are met.

Document received by the VA Arlington 17th Circuit Court.

53.     Indeed, in addition to the strong ethical concerns about the settlement transactions, the unjustifiably inflated settlement payments constituted a misuse of public assets in violation of Virginia Code § 18.2-111, 18.2-112.1 and federal law.   These were payments for purposes other than the funds' required use and not for any legitimate government interest (i.e. without "proper grounds").  The illegitimate use of Commonwealth grants money also violated the terms of the terms of the Funding Agreement between the Commonwealth of Virginia and the MWAA of 2014 that provided a grant of $300,000,000 of taxpayer funding to the MWAA (the "Funding Agreement").  The Funding Agreement required that grant money be used "***solely*** to fund the design and construction of Phase 2 of the Project and to reduce the portion of the Phase 2 design and construction costs that, under the Agreement to Fund the Capital Cost of Construction of Metrorail in the Dulles Corridor, dated July 19, 2007, by and between Fairfax County, Loudoun County and MWAA, is to be funded by a contribution from revenues of the DTR."  The excessive settlement payments would mean that contributions from the revenues of DTR (the Dulles Toll Road) were not being used to reduce costs funded by contributions from revenues of the DTR, and those contributions would instead likely need to be increased.

54.     Making payments to primary contractors for work not performed and for purely private, political purposes also contravened the authority granted to the MWAA pursuant to Virginia Code § 5.1-156, which enumerates the powers and duties of the MWAA.  All of the MWAA's powers, including its power to enter into contracts are limited by its "***purpose of acquiring, operating, maintaining, developing, promoting and protecting Ronald Reagan Washington National Airport and Washington Dulles International Airport together as primary airports for public purposes*** serving the metropolitan Washington area . . ."  Va. Code §

Document received by the VA Arlington 17th Circuit Court.

5.1-156.A(11).  Because these agreements were not intended to further that purpose, but instead were for political gain, the global settlements were *ultra vires* and therefor unlawful.

55.    Mr. Crehan repeatedly raised concerns about the legality of unjustifiable payments and payment orders to be used to satisfy the change orders for the global settlement.  These payments would necessarily be paid using the Commonwealth's grant money, and would not further the purposes set forth under Virginia Code § 5.1-156 and would not reduce reliance on the Dulles Toll Road as required under the Funding Agreement.  Rather, these payments would likely lead to increased reliance on the Dulles Toll Road and higher tolls.  Mr. Crehan normally had to approve payments of contractor invoices.  On several occasions, Mr. Crehan warned leadership about the invoices for unjustified payments and demanded that he be removed from the approval list, specifically stating that he would not approve a payment he felt was improper or illegal.  For example, Mr. Crehan warned Mr. Haskell, then project director, that he, Mr. Crehan, needed to come off the approval list for the global settlement payments to the two lead contractors.  He also had himself taken off the approval list for at least one of the retainage releases.

56.    In retaliation for Mr. Crehan's stated concerns and refusals to participate in payments that Mr. Crehan advised lack legal justification, MWAA managers took certain steps to circumvent Mr. Crehan's role, as Rail Project counsel, in connection with claims involving the Rail Project.

57.    Just months after his refusals, in or around October 2022, Mr. Crehan had a phone call with Ms. Spera after Mr. Crehan had pressed on numerous occasions for a discussion surrounding his return to the main Legal office. On that call, Ms. Spera told Mr. Crehan that he

Document received by the VA Arlington 17th Circuit Court.

would be laid off after the completion of the Rail Project through a "reduction in force" of the entire then-remaining Rail Project MWAA employees.

58.    In response to Mr. Crehan's inquiries, Ms. Spera declined to explain how Mr. Crehan could be laid off as part of the Rail Project department, given that Mr. Crehan was actually part of the Legal Department.  Ms. Spera stated that the matter was controlled by the Human Resources Department.

59.    As the Rail Project neared completion, approximately eight MWAA employees on the Rail Project team were reabsorbed into their departments.

60.    On November 15, 2022, Phase 2 of the Silver Line Rail Project opened to riders.

61.    On January 24, 2023, MWAA held a meeting during which HR announced the layoff or "Reduction in Force" (RIF) of Rail Project staff, some as early as March 10, 2023.

62.    At the January 24, 2023 meeting, Mr. Crehan received a notice of RIF effective March 10, 2023.  He received a final paycheck and 10 weeks' severance on the next pay date, which was March 21, 2023.

63.    Mr. Crehan was not terminated for cause, or for any performance-based reasons. Mr. Crehan was terminated in retaliation for his proper advice.  Including Mr. Crehan in the RIF was nothing more than a pretext for MWAA to attempt to cover up its retaliatory termination of Mr. Crehan.

64.    Mr. Crehan's termination was surprising and puzzling. First, MWAA had promised, and it was a fundamental part of Mr. Crehan accepting employment, that he would remain in the Legal Department upon completion of the Rail Project.  Second, his termination came at a time when MWAA needs lawyers with Mr. Crehan's experience (and especially with his track record of excellent performance reviews) as it begins to rework its real estate holdings

Document received by the VA Arlington 17th Circuit Court.

and launches billions in new construction.  MWAA recently began a multi-billion dollar construction program including two new terminals and completion of the Dulles passenger tram system – the very same type of work Mr. Crehan had been doing for the past 10 years, and for which he was more than qualified.  That construction program requires people to do the same kinds of work as the people MWAA is laying off, including Mr. Crehan.

65.    In addition, Mr. Crehan's termination is in violation of MWAA's written "Reduction in Force" policy, which states that before a person can be laid off, that person's VP/GC must find that there are one or more excess positions with that title, and then lay off holders of that position, based on a formula that, for the legal group, amounts to seniority.  Mr. Crehan had the most seniority in the group. If MWAA followed its written policy, the other four Associate General Counsel would have been targeted for layoff before Mr. Crehan.[4]

66.    Although MWAA contends that it is following its RIF policy, even Ms. Spera has declined to defend MWAA's interpretation of the RIF policy, and instead, has avoided and refused to discuss it with Mr. Crehan, asserting that she has not looked at the policy closely, and that "HR controls that decision."

67.    When Mr. Crehan emailed Anthony Vegliante, SVP for HR, asking him to explain where he, Mr. Crehan, had misunderstood the policy, Mr. Vegliante refused to respond and directed a subordinate, Robin Wade, to tell Mr. Crehan that he could be laid off because his "employer" is the accounting category for Rail Project spending.   Mr. Crehan replied by

---

[4] MWAA Layoff and Reduction-in-Force (RIF) Directive, September 2020, § 5.4:  "The Labor and Employee Relations Department shall designate the employees affected by the Layoff or RIF on the Retention Register in inverse order of their ranking (bottom first) until the required number of jobs is reached. If two or more employees have the same total retention score, the most junior employee is designated as affected by the Layoff or RIF before the others."

14

Document received by the VA Arlington 17th Circuit Court.

explaining that his employer is MWAA and again requesting a response in terms of the written RIF policy.  HR did not respond.

68.    MWAA's intentional and flagrant violation of its own written RIF policy reflects MWAA's retaliation against Mr. Crehan for his proper advice.

**COUNT ONE –**
**RETALIATION AND RETALIATORY TERMINATION**
**IN VIOLATION OF VIRGINIA WHISTLEBLOWER**
**PROTECTION LAW, VA. CODE § 40.1-27.3**

69.    The foregoing allegations are incorporated as if realleged herein.

70.    The Virginia whistleblower protection law, House Bill 798, signed into law on April 11, 2020 protects an employee who, "in good faith reports a violation of any federal or state law or regulation to a supervisor . . ." or "[r]efuses to engage in a criminal act that would subject the employee to criminal liability .. . ." and prohibits an employer from discharging, disciplining, threatening, discriminating against, or penalizing an employee, or taking other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee made any such report or refused to engage in any such conduct.

71.    Mr. Crehan is a resident and citizen of the Commonwealth of Virginia, and as such, held the rights guaranteed by the Virginia whistleblower protection law.

72.    Mr. Crehan's right to report potential serious violations of state or federal law and/or regulations and/or ethical violations that would lead to violations of state or federal law, is clearly established under relevant law.

73.    During the course of his employment, Mr. Crehan consistently advised MWAA management that the use of Rail Project funds to make settlement payments far exceeding the

Document received by the VA Arlington 17th Circuit Court.

amounts owed to contractors, and not justified by litigation risk, would violate federal and state regulations pertaining to use of government funds.

74.    Mr. Crehan's relevant advice included, but was not limited to, written memos to MWAA's then-General Counsel in December 2019 and July 2022.

75.    MWAA's Code of Ethics requires employees to report any good-faith belief that an ethics violation was occurring.

76.    Around July 2022, Ms. Spera told Mr. Crehan that his discussion of the best results MWAA might achieve against contractor claims was unwelcome, but did not state that the advice was incorrect.  Ms. Spera stated specifically that Mr. Crehan's advice with respect to a particular contractor claim "made people [senior management] angry."

77.    In retaliation for Mr. Crehan's position, MWAA engaged in a course of retaliation against Mr. Crehan, in order to excuse his eventual termination at the end of the Rail Project (his intimate knowledge of the construction contract, and the requirements for turnover to WMATA, was indispensable until completion).

78.    As the Rail Project neared completion, when approximately eight other team members were reabsorbed into their departments, Mr. Crehan was terminated, in violation, and without regard to, MWAA's written "Reduction in Force" policy.

79.    Although MWAA contends that it was following its RIF policy, even Ms. Spera has declined to defend MWAA's interpretation of the RIF policy, and instead, avoided and refused to discuss it with Mr. Crehan, with the excuse that she had not looked at the policy as closely as had Mr. Crehan, and "HR controls that decision."  Notably, Ms. Spera, who was Mr. Crehan's predecessor as Rail Project attorney, had returned to MWAA's General Counsel office at Reagan National Airport when her tenure as Rail Project attorney ended.

16

Document received by the VA Arlington 17th Circuit Court.

80.     When Mr. Crehan emailed HR asking how his interpretation of the RIF policy was incorrect, Mr. Crehan was told that he could be laid off because his "employer" is the accounting category for Rail Project spending. (MWAA accounts for toll road and rail activities separately from airport activities.) The statement that Mr. Crehan's employer is not MWAA is false, as Mr. Crehan is an employee of MWAA's Legal Department, and HR did not offer any response when Mr. Crehan pointed this out.

81.     MWAA's intentional and flagrant violation of its own written RIF policy reflects MWAA's retaliation against Mr. Crehan for his position with respect to actions by MWAA's leadership.

82.     The adverse actions taken against Mr. Crehan were retaliatory and entirely unjustified and unwarranted based on his performance.

83.     MWAA's retaliation, including retaliatory termination, against Mr. Crehan led to economic damages, loss of benefits, significant emotional distress and public and amount to professional disparagement.

84.     By retaliating against Mr. Crehan, MWAA exhibited an extreme reckless disregard of, and callous indifference to, his rights under Virginia law.  Defendant's actions described above were in willful and wanton disregard of Plaintiff's rights, and taken in order to specifically to injure him for his position with respect to MWAA's actions.

85.     Mr. Crehan suffered harm as a result of MWAA's retaliation and retaliatory termination, including loss of advancement and career opportunities and the attendant employment benefits.

86.     As a direct and proximate result of Defendant's conduct, Mr. Crehan has suffered, and will in the future suffer, great damage including loss of past and future income, loss of career

Document received by the VA Arlington 17th Circuit Court.

and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, anxiety, insomnia, loss of confidence, embarrassment, professional disparagement, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

87.     Pursuant to Va. Code § 40-1-27.3(C), Mr. Crehan is entitled to injunctive relief, reinstatement, restoration of lost benefits, back pay for lost wages, bonus pay, compensatory damages, and litigation costs including attorney's fees.

## COUNT TWO –
## COMMON LAW WRONGFUL TERMINATION OF EMPLOYMENT FOR OPPOSING OR RESISTING CRIMINAL CONDUCT

88.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

89.     MWAA terminated Mr. Crehan because he resisted and opposed the potentially illegal conduct by MWAA by repeatedly raising concerns about payments that appeared to violate applicable law, and refusing to participate in approval of the related invoice payments to contractors.  Mr. Crehan raised concerns in writing about the legality of the transactions, including in December 2019 and just three months prior to Ms. Spera informing him of his termination.  In his July 8, 2022 email  to Ms. Spera, Mr. Crehan stated his opposition to the global settlement due their apparent illegality.

90.     Mr. Crehan refused to approve payments of invoices that funded improper settlement payments to contractors, repeatedly verbalizing and memorializing his concerns in writing about the legality and propriety of such payments, and he demanded that he be removed from approval lists for these payments.  He also removed himself from the approval list for at

Document received by the VA Arlington 17th Circuit Court.

least one retainage release stating that he would not approve a payment he felt was improper and potentially illegal.

91.    The settlement payments to the primary contractors constituted a misuse of public assets in violation of Virginia Code § 18.2-112.1 as these were payments for solely political purposes and not for work actually performed.  The allocation of grant money contravenes the Funding Agreement and the duties and powers of MWAA provided under Virginia Code 5.1-156.A.

92.    Mr. Crehan's termination also violated the public policies underlying the criminal law of the Commonwealth of Virginia, which expressly prohibits the conduct of MWAA, including its conversion and misuse of public assets as described in Virginia Code § 18.2-112.1, in addition to the public policy against whistleblowing for such conduct, codified at Virginia Code § 40.1-27.3.   Mr. Crehan is a member of the classes of persons these statutes are designed to protect, as a taxpayer with respect to the criminal prohibition and as employee reporting criminal conduct with respect to Virginia's whistleblower protection law.

93.    Mr. Crehan's discharge was based on his refusal to engage in a criminal act—the approval of payments of grant funds to contractors other than amounts due under the applicable contracts or defensible as dispute settlements, but instead made for solely private and political reasons.

94.    MWAA violated a policy enabling the exercise of Mr. Crehan's rights under Virginia Code § 40.1-27.3.

95.    Mr. Crehan's termination, and the events leading up to that termination, violated public policy; evidenced malice, spite, and ill will; was willful and wanton; and evinced a conscious disregard for the rights of Mr. Crehan

Document received by the VA Arlington 17th Circuit Court.

96.      As a direct and proximate result of MWAA's actions, Mr. Crehan has suffered

and continues to suffer emotional distress, mental anguish, past and future loss of income and

benefits of employment, lost career and business opportunities and advancement, other past

pecuniary losses, future pecuniary losses, and other non-pecuniary losses.  Mr. Crehan is entitled

to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff MICHAEL T. CREHAN requests that this Court enter judgment

in his favor, against the Defendant, METROPOLITAN WASHINGTON AIRPORTS

AUTHORITY on the above Count; and further:

(a)      Award Mr. Crehan compensatory damages to be determined by a jury, and in no

event to exceed Ten Million Dollars ($10 million), plus demonstrated past and

future pecuniary damages on the above-stated Count (including pre-judgment

interest); and in addition

(b)      Award Mr. Crehan reinstatement of his position, back pay, interest on the back

pay, and compensation for any damages sustained because of the retaliation on

the above stated Count; and in addition

(c)      Award Mr. Crehan an injunction prohibiting MWAA from further engaging in the

illegal practices that have deprived Mr. Crehan of his pay and benefits; and in

addition

(d)      Award Mr. Crehan attorneys' fees and costs, and such other and further relief as

may be appropriate under the circumstances.

### JURY DEMAND

**PLAINTIFF MICHAEL T. CREHAN DEMANDS A TRIAL BY JURY.**

Document received by the VA Arlington 17th Circuit Court.

September 29, 2023                          Respectfully submitted,

                                           */S/ CARLA D. BROWN*
                                           Carla D. Brown, VSB 44803
                                           cbrown@cbcblaw.com
                                           CHARLSON BREDEHOFT COHEN
                                             BROWN & NADELHAFT, P.C.
                                           11260 Roger Bacon Drive, Suite 201
                                           Reston, VA  20190
                                           (703) 318-6800  Telephone
                                           (703) 318-6808  Facsimile
                                           *Counsel for Plaintiff, Michael T. Crehan*

Document received by the VA Arlington 17th Circuit Court.

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 29th day of September 2023, the foregoing Amended Complaint was filed as Attachment 1 to Plaintiff's Motion for Leave to File Amended Complaint, and that copy was sent via the Arlington Circuit Court's TrueFiling electronic filing system, to counsel for Defendant:

       Joseph W. Santini, Esq.
       Morris Kletzkin, Esq.
       FRIEDLANDER 1MISLER, PLLC
       5335 Wisconsin Ave., NW, Suite 600
       Washington, D.C.  20015
       (202) 872-0800 Telephone
       (202) 857-8343 Facsimile
       jsantini@fmlaw.com
       mkletzkin@finlaw.com

                 */S/ CARLA D. BROWN*
                 Carla D. Brown, VSB 44803
                 cbrown@cbcblaw.com
                 CHARLSON BREDEHOFT COHEN
                  BROWN & NADELHAFT, P.C.
                 11260 Roger Bacon Drive, Suite 201
                 Reston, VA  20190
                 (703) 318-6800  Telephone
                 (703) 318-6808  Facsimile
                 *Counsel for Plaintiff, Michael T. Crehan*

Document received by the VA Arlington 17th Circuit Court.

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR ARLINGTON COUNTY

| | | |
|---|---|---|
| MICHAEL T. CREHAN | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. CL 23-2380 |
| | : | |
| METROPOLITAN WASHINGTON | : | |
| AIRPORTS AUTHORITY, | : | |
| | : | |
| Defendant. | : | |

## PRAECIPE

PLEASE TAKE NOTICE that the Defendant Metropolitan Washington Airports Authority's previously filed **Demurrer and Plea in Bar to Complaint** should be placed on the Court's **October 6, 2023, 10:00 a.m., Civil Motions' Docket** for hearing, or as soon thereafter as counsel may be heard.

It is anticipated that the hearing of this matter shall not take longer than thirty (30) minutes.

Respectfully submitted,

METROPOLITAN WASHINGTON AIRPORTS AUTHORITY

By:_____

Counsel

Document received by the VA Arlington 17th Circuit Court.

Of Counsel:

Joseph W. Santini, VSB #47377
Morris Kletzkin, VSB #88181
FRIEDLANDER MISLER, PLLC
5335 Wisconsin Ave., NW, Suite 600
Washington, D.C.  20015
(202) 872-0800
(202) 857-8343 (fax)
jsantini@fmlaw.com
mkletzkin@fmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Praecipe was sent via

electronic and first-class mail, postage prepaid, this 14th day of September 2023, to:

Carla Brown, Esq.
Charlson Bredehoft Cohen Brown & Nadelhaft, P.C.
11260 Roger Bacon Dr., Suite 201
Reston, VA 20190
*cbrown@charlsonbredehoft.com*

Joseph W. Santini

Document received by the VA Arlington 17th Circuit Court.

2

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR ARLINGTON COUNTY

| | | |
|---|---|---|
| MICHAEL T. CREHAN | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. CL 23-2380 |
| | : | |
| METROPOLITAN WASHINGTON | : | |
| AIRPORTS AUTHORITY, | : | |
| | : | |
| Defendant. | : | |

### AMENDED PRAECIPE

PLEASE TAKE NOTICE that the Defendant Metropolitan Washington Airports Authority's previously filed **Demurrer and Plea in Bar to Complaint** should be **removed** from the Court's **October 6, 2023, 10:00 a.m., Civil Motions' Docket** without prejudice. Plaintiff has filed a Motion for Leave to Amend Complaint which will need to be heard prior to any hearing on Defendant's Demurrer and Plea in Bar.

Defendant will re-notice its Demurrer and Plea in Bar for hearing following a hearing on Plaintiff's Motion for Leave to Amend Complaint if necessary.

Respectfully submitted,

METROPOLITAN WASHINGTON AIRPORTS
AUTHORITY

By:_____
                Counsel

Of Counsel:

Joseph W. Santini, VSB #47377
Morris Kletzkin, VSB #88181
FRIEDLANDER MISLER, PLLC
5335 Wisconsin Ave., NW, Suite 600
Washington, D.C.  20015
(202) 872-0800
(202) 857-8343 (fax)
jsantini@fmlaw.com
mkletzkin@fmlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Amended Praecipe was sent

via electronic and first-class mail, postage prepaid, this 2nd day of October 2023, to:

Carla Brown, Esq.
Charlson Bredehoft Cohen Brown & Nadelhaft, P.C.
11260 Roger Bacon Dr., Suite 201
Reston, VA 20190
*cbrown@charlsonbredehoft.com*

_____
Joseph W. Santini

2